UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| STARBURST DATA, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOSHUA ROBERT HEWITT, <br><br> Defendant. | Case No. 1:25-cv-209 |

**COMPLAINT**

PRELIMINARY STATEMENT

1. Joshua Hewitt was a trusted employee of Starburst Data, Inc. He had sole control responsibility for Starburst's hardware and software inventory and had access to the company's credit accounts. An internal investigation revealed that Hewitt stole Starburst's equipment, shipping it—at Starburst's expense—to friends and other third parties, and keeping the profits for himself. Hewitt also misused the company's credit cards and other credit accounts for his personal benefit. When confronted, Hewitt lied about what he had done. Starburst fired Hewitt and now brings this civil action to recover for the significant losses it has suffered.

JURISDICTION & VENUE

2. The plaintiff, Starburst Data, Inc. ("Plaintiff," or "Starburst"), is a Delaware corporation with its principal place of business in Massachusetts.

3. The defendant, Joshua Robert Hewitt ("Defendant," or "Hewitt"), is a citizen of North Carolina.

4. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

6. Venue lies in this Court pursuant to 28 U.S.C. § 1391 because the only Defendant in this action resides in this judicial district.

## FACTS

### Hewitt's Employment

7. Starburst was founded in 2017. It is a data analytics platform that provides its customers with a single point of access to query and store large amounts of data.

8. Hewitt began working for Starburst as a Systems Engineer for Plaintiff on December 13, 2021. He was a remote employee who worked from his home in High Point, NC.

9. Hewitt was Starburst's primary contact with all of the company's hardware and software vendors.

10. He also had sole responsibility for managing Starburst's computer equipment and peripheral inventory.

11. Starburst gave Hewitt administrator access to its Amazon Business account, Apple Business Manager account, and UPS account, which he needed in order to perform his job duties.

12. Hewitt also had access to Starburst's credit cards, which had a combined monthly limit of $365,000.

13. When a Starburst employee's employment terminated, Hewitt was responsible for inventorying the equipment in that employee's possession and returning it to Starburst's outside asset vendor, ExpoIT.

14. Hewitt worked for Starburst until October 31, 2024, when Starburst terminated his employment based on the results of an internal investigation, described below.

## The Internal Investigation

15. On or about October 14, 2024, Starburst's former Information Technology Manager, Larry Bullins, informed the company's Human Resources department that he had discovered, prior to Bullin's last day of work with Starburst on October 12, 2024, that Hewitt had made a few unauthorized personal purchases using Starburst's accounts. Bullins recommended that Starburst investigate further.

16. Following some initial inquiries, including conversations with Hewitt, Starburst placed Hewitt on administrative leave and began an internal investigation.

17. On October 29, 2024, Starburst's Chief People Officer, Megan Maslanka, asked Hewitt about two credit card expenses that did not have a supporting receipt.

18. Hewitt told Maslanka that he was unaware of the purchases and would "ask around" to find out about the purchases.

19. Maslanka told Hewitt that Hewitt needed to report these purchases as fraud.

20. Hewitt informed Maslanka that the two companies from which someone had made the purchases, Adorama and B&H Photo, could not provide any information about the purchases for privacy reasons, but that they had cancelled the orders.

21. Maslanka began to oversee the internal investigation, along with Sarah Register-Beyer, Plaintiff's Director of People Programs and Operations and Christine Ryan, Human Resources Business Partner.

22. As part of the internal investigation, Maslanka, Register-Beyer, and Ryan accessed Starburst's Amazon Business account to compare purchases against Starburst's Information Technology spend.

23. On October 30, and October 31, 2024, Register-Byer interviewed Hewitt as part of the internal investigation.

24. Register-Byer asked Hewitt about over $31,000 in Amazon purchases, including gaming sound cards, a gaming wireless mouse, a gaming keyboard, switches, cables, cords, routers, headphones, iPads, and iPhone accessories.

25. In response, Hewitt said that all of the purchases were approved by Bullins, even though Starburst did not have a business need for some of the equipment Hewitt purchased.

26. Register-Byer then interviewed Bullins, who said that Hewitt's explanation was false, that he had not approved any of the purchases, and that he had reported Hewitt's expenditures to human resources for investigation.

27. On October 31, 2024, Maslanka reviewed Starburst's UPS business account as part of the internal investigation. Maslanka discovered that Hewitt had been using the account to ship equipment to third-party non-employees, with some charges of more than $600 per overnight shipment.

28. The UPS account history contained pictures of laptop boxes that Hewitt had uploaded to document shipments throughout the United States to third party non-employees.

29. On November 1, 2024, Ryan contacted a listed account from the UPS account history, Highland Restaurant Supply in Fall River, Massachusetts.

4

4237855_1

Case 1:25-cv-00209-TDS-JLW     Document 1     Filed 03/18/25     Page 4 of 11

30. "Brandon," a representative of Highland Restaurant Supply, told Ryan that "his friend" had sent him a laptop; Brandon then identified Hewitt, by name, as the person who had sent him the laptop.

31. Register-Beyer researched Starburst's Apple Care account and found that there were gaps in the transfer of Starburst's devices.

32. Register-Beyer then reviewed Starburst's Apple Business account and found that Hewitt had released many laptops from Starburst's account and re-allocated them to third party non-employees.

33. On November 1, 2024, Ryan ran an eBay search using Hewitt's personal email address and found that Hewitt had an account established under user name djhewi1025.

34. According to eBay's history of the djhewi1025 account, Hewitt had sold over 80 laptops and peripherals on eBay. On information and belief (the eBay listings do not show serial numbers, but the descriptions of the laptops matched the laptops Starburst uses in its business), these items belonged to Starburst, and Hewitt had sold them for his own profit.

35. On November 1, 2024, Maslanka, Register-Byer, and Ryan met with representatives from Starburst's external IT asset manager, ExpoIT.

36. During this meeting, they found there were significant gaps in the inventory Hewitt was responsible for managing.

37. Additionally, during this meeting, they learned that Hewitt had an unusually high number of requests to ExpoIT to send equipment directly to his home address. ExpoIT ordinarily ships the equipment directly to Starburst employees for their use.

38. Based on what Maslanka, Register-Byer and Ryan learned in this meeting, Starburst estimates that approximately 106 laptops under Hewitt's management were missing.

39. On November 4, 2024, Maslanka discovered that Hewitt had made unauthorized personal charges on his company credit card accounts with no business purpose. These personal charges included monthly subscriptions for Microsoft gaming programs and for Google voice accounts (to place and receive calls and texts).

40. During the internal investigation, Hewitt claimed that all of his purchases were for business purposes, were approved by his superiors, or both.

41. During the internal investigation, Hewitt's superiors denied that they had approved his purchases and stated his explanation was patently false.

42. On November 11, 2024, while on administrative leave pending the results of the internal investigation, Hewitt made another attempt to ship an item, without a business justification, by using Starburst's UPS business account at a shipping cost of $132.87. UPS declined to ship the item, as Starburst had suspended Hewitt's access to its accounts as part of the internal investigation.

43. Starburst terminated Hewitt's employment for cause, effective October 31, 2024.

44. As part of the internal investigation, Starburst confirmed that it is missing over 46 laptops by serial number, with a value of $2,000 to $5,000 per laptop and an expected four- year life. Hewitt was responsible for managing and overseeing these laptops.

45. Starburst has also confirmed that an additional 60 laptops that either ExpoIT or employees whose employment had ended in FY24 and FY25 had shipped directly to Hewitt's home address are also unaccounted for.

46. Starburst has been forced to purchase additional laptops for employees, and it did not receive retired laptop credits from its vendors. Those credits range from $400 to $800 per laptop.

47. Based on Plaintiff having to replace a laptop sooner than anticipated based on Hewitt's actions, the cost of misappropriating one laptop ranges from approximately $5,000 to $10,000, based on the laptop model and early replacement.

48. Plaintiff has also incurred at least $31,000 in fraudulent Amazon purchases on its Amazon Business Account by Hewitt and these purchases, mostly computer peripherals, remain all unaccounted.

49. Hewitt utilized Plaintiff's UPS account for total shipping charges of at least $7,000 that were not business shipments to any of Plaintiff's employees.

50. Plaintiff's counsel sent a demand to Hewitt seeking a return of its property or full restitution.

51. In response to Plaintiff's demand, Hewitt returned eleven laptops belonging to Plaintiff that he had at his residence.

52. There are still 95 laptops missing that were under Hewitt's management and control.

53. Starburst has suffered damages in an amount of at least $475,000 to $1.425 million as a result of Hewitt's wrongful acts.

54. Hewitt consciously and intentionally disregarded or was indifferent to Starburst's rights and knew or reasonably should have known that his conduct was reasonably likely to result in injury, damage, or other harm to Starburst.

Count 1<br>Conversion

55. Starburst incorporates the allegations of paragraphs 1 to 53.

56. Until the time that Hewitt came into possession of the property in question, Starburst was its lawful owner and was entitled to its immediate possession.

57. Hewitt wrongfully converted the property in question to his own use.

58. Starburst has suffered an injury as the proximate result of Hewitt's conversion of its property.

Count 2
Breach of Fiduciary Duty

59. Starburst incorporates the allegations of paragraphs 1 to 57.

60. A fiduciary relationship existed between Starburst and Hewitt, and Hewitt, as Starburst's employee and agent, owed Starburst a fiduciary duty. Specifically, Starburst reposed special trust and confidence in Hewitt including but not limited to by vesting Hewitt with special managerial, administrative, and other job functions, such that Starburst was totally dependent on Hewitt in connection with the performance of those functions.

61. Hewitt failed to act in good faith and with due regard to Starburst's interests.

62. Hewitt breached his fiduciary duty.

63. Starburst has suffered an injury as the proximate result of Hewitt's breach of duty.

Count 3
Constructive Fraud

64. Starburst incorporates the allegations of paragraphs 1 to 62.

65. A fiduciary relationship existed between Starburst and Hewitt. Starburst entrusted Hewitt with sole responsibility for the management of its IT inventory and gave him access to the company's credit accounts. He was Starburst's agent.

66. Through the facts and transactions alleged above, Hewitt took advantage of his position of trust and sought to benefit himself. He acted with the specific intent to defraud Starburst.

67. Starburst has suffered an injury as the proximate result of Hewitt's abuse of his position of trust for his own benefit.

## Count 4
### Larceny (N.C.G.S. § 1-538.2)

68. Starburst incorporates the allegations of paragraphs 1 to 67.

69. Hewitt was a servant or employee of Starburst.

70. Starburst had delivered its property to Hewitt to be safely kept for Starburst's benefit.

71. Hewitt took such property with the intent to steal it and defraud Starburst, contrary to the trust and confidence Starburst had reposed in him, or embezzled the property, or converted it to his own use.

72. Starburst has suffered an injury as the proximate result of Hewitt's larceny, fraud, embezzlement, or conversion.

## Count 5
### Unjust enrichment

73. Starburst incorporates the allegations of paragraphs 1 to 72.

74. Starburst conferred a measurable benefit on Hewitt.

75. The benefit was not conferred officiously or gratuitously.

76. Hewitt consciously accepted the benefit.

77. Hewitt has been unjustly enriched at Starburst's expense and is required to make restitution.

## DEMAND FOR RELIEF

Therefore, Starburst demands judgment against Hewitt for the following relief:

1. Compensatory damages in an amount to be determined at trial, including the costs of the internal investigation.

2. Reasonable attorney's fees.

3. Punitive damages.

4. Imposition of a constructive trust on the property of Starburst in Hewitt's hands.

5. Interest.

6. Costs.

7. Such other relief to which the Court finds Starburst is entitled at law or in equity.

DEMAND FOR TRIAL BY JURY

The plaintiff demands trial by jury.

Respectfully Submitted,

STARBURST DATA, INC.

By its attorneys:

/s/ Theodore J. Folkman

Theodore J. Folkman (special appearance)
Julayne Lazar (special appearance)
Taylor M. Makson (special appearance)
RUBIN AND RUDMAN LLP
53 State Street
Boston, MA 02109
(617) 330-7000
tfolkman@rubinrudman.com
jlazar@rubinrudman.com
tmakson@rubinrudman.com



|     |                                      |
| --- | ------------------------------------ |
| By: | /s/ Bo Caudill                       |
|     | Bo Caudill                           |
|     | N.C. Bar No. 45104                   |
|     | bocaudill@villmercaudill.com         |
|     | Villmer Caudill, PLLC                |
|     | P.O. Box 18186                       |
|     | Charlotte, NC 28218                  |
|     | Tel: (704) 216-8255                  |
|     | *Local Counsel*                      |

Dated: March 18, 2025.