UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No: 1:25-cv-00209-TDS-JLW

STARBURST DATA, INC.,

PLAINTIFF,

v.

JOSHUA ROBERT HEWITT,

DEFENDANT.

**<u>MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

Theodore J. Folkman (BBO No. 647642)
Ryan G. Douglas (BBO No. 707895)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
rdouglas@rubinrudman.com

## PRELIMINARY STATEMENT

This is a case of abuse of trust. Starburst is a data analytics company that builds software tools for businesses. It depends on its employees for smooth and successful business operations. For Joshua Hewitt, this meant overseeing and placing inventory orders, and handling company laptops that were supposed to be shipped to vendors or securely stored. He was the person principally in charge of managing the laptop inventory used by hundreds of employees.

In the fall of 2024, Starburst noticed unauthorized charges on Hewitt's company credit cards. Specifically, Hewitt had made personal purchases and had racked up unapproved shipping fees. When Starburst reviewed Hewitt's records more closely, what it found was alarming. More than a hundred laptops under Hewitt's supervision were missing. Hewitt had shipped devices to his own home, then sold and shipped them to people outside the company. Many of the devices had been listed and sold on his personal eBay account. Starburst also uncovered over $30,000 in unauthorized Amazon purchases tied to Hewitt's company account and thousands of dollars more in UPS charges used to send laptops to buyers who had no connection to Starburst's business.

Starburst has shown clear, provable losses that far exceed the $75,000 jurisdictional threshold, and it has plausibly alleged that Hewitt used his role to misappropriate and sell company property for personal gain. This Court should deny Hewitt's motion.

## FACTUAL BACKGROUND

A. <u>Hewitt's role and access at Starburst.</u>

Joshua Hewitt began working for Starburst Data, Inc. in December 2021 as a systems engineer based in High Point, North Carolina, where he worked from home. (Compl. ¶¶ 7-8). His responsibilities quickly expanded, placing him in charge of managing nearly all the company's

hardware assets, including laptops, electronic accessories, shipping, and storage. (Compl. ¶¶ 9-10, 13). Hewitt managed all IT-related orders, maintained inventory, and tracked hardware movement across the company. (*Id.*). Additionally, he was responsible for handling laptops of employees who left the company, either redistributing them internally or sending them to ExpoIT, Starburst's vendor, for secure disposal or resale. (Compl. ¶ 13). Given his role, Hewitt had comprehensive access to critical company systems, including administrative credentials for Starburst's Amazon Business account, Apple Business Manager, and the UPS shipping portal. (Compl. ¶¶ 11-12). He also had two company-issued credit cards with a combined monthly spending limit of $365,000. (Compl. ¶ 12). This extensive access made him the primary custodian of significant company property, a position of trust he later abused. (Compl. ¶¶ 1, 10-11, 44-54, *passim*).

B. Starburst's investigation into Hewitt's misuse of company property.

In October 2024, former IT manager Larry Bullins alerted Starburst's Human Resources department to unauthorized personal purchases made by Hewitt using the company's Amazon account. (Compl. ¶ 15). This report led to an internal investigation and resulted in Hewitt being placed on administrative leave. (Compl. ¶ 16). Chief People Officer Megan Maslanka confronted Hewitt about two suspicious credit card charges early in the investigation. (Compl. ¶ 17). Hewitt initially claimed ignorance, promising to investigate further, but subsequently provided contradictory explanations that conflicted with the available records. (Compl. ¶¶ 18-20).

A thorough review of Starburst's Amazon account uncovered over $31,000 in unauthorized purchases unrelated to company business. (Compl. ¶¶ 21-26; Maslanka Dec. ¶ 21). These included consumer electronics such as gaming headsets, tablets, and networking devices that had no legitimate business justification. (Compl. ¶¶ 24-26; Maslanka Dec. ¶ 22). Shipping

records confirmed that these items were frequently delivered directly to Hewitt's personal residence. (Compl. ¶ 37). Additionally, Starburst identified more than $7,000 in unauthorized shipping charges on the company's UPS account, linked directly to Hewitt. (Compl. ¶¶ 27, 49; Maslanka Dec. ¶¶ 23-26). These shipments, often sent via expensive overnight services, were addressed to individuals and locations with no affiliation to Starburst. (Compl. ¶¶ 27-28, 49).

Further investigation into the Apple Business Manager account revealed devices being systematically removed and reassigned to private individuals without approval. (Compl. ¶¶ 31-33). Cross-referencing these devices with eBay listings led Starburst to an eBay account (username "djhewi1025") linked directly to Hewitt's personal email. (Compl. ¶¶ 33-34). This account listed and sold more than 80 laptops identical to those missing from Starburst's inventory. (Compl. ¶ 34).

The internal investigation further revealed that approximately 106 laptops went missing during company-wide layoffs in June and July 2023. (Compl. ¶ 38; Maslanka Dec. ¶ 8). During this period, Hewitt was the primary employee tasked with collecting laptops from departing personnel. (Compl. ¶ 10). Historically, Starburst had a laptop return rate of around 98% but conservatively estimated a lower return rate of 68% given the circumstances. (Maslanka Dec. ¶¶ 4-5). Despite this conservative estimate, only 45 laptops were documented as being sent to Hewitt from the reduction in force employees. (Maslanka Dec. ¶¶ 6-7). Coupled with documented diversions through Hewitt's Slack requests and eBay sales, Starburst concluded that Hewitt was responsible for the disappearance of approximately 106 laptops. (Maslanka Dec. ¶ 8-20).

Starburst does not yet know what happened to every laptop that went missing. But the investigation showed a clear pattern: Hewitt had laptops shipped to his home, failed to send them

to Starburst's vendor, and sold many through an eBay account tied to his personal email. (Maslanka Dec. ¶¶ 6–20, 28). During the June and July 2023 layoffs, Starburst expected to recover at least 61 laptops. Only 45 were recorded as "returned", all having been shipped to Hewitt. (Maslanka Dec. ¶ 6). Of those, he gave back just 11. (Compl. ¶ 51). Starburst believes Hewitt received and sold the remaining devices based on multiple Slack communications in which he directed laptop shipments to his home, vendor records showing the devices never reached their proper destination, and sales listings on an eBay account tied to his personal email, matching the same makes, models, and serial numbers. (Maslanka Aff. ¶¶ 6–20, 28).

C. <u>Continued misuse by Hewitt.</u>

Even after being placed on administrative leave, additional unauthorized recurring charges surfaced, including personal Microsoft gaming subscriptions and Google Voice services charged to company accounts. (Compl. ¶¶ 39-42). Hewitt repeatedly asserted these charges were approved by supervisors, a claim consistently refuted by the supervisors themselves. (Compl. ¶¶ 40-41). Hewitt was terminated for cause on October 31, 2024. (Compl. ¶ 43). Starburst demanded the return of misappropriated equipment, but Hewitt returned only 11 laptops. (Compl. ¶¶ 50-51). Consequently, approximately 95 laptops remain unaccounted for, each holding a resale value between $400 and $800. (Compl. ¶¶ 44-56, 52; Maslanka Dec. ¶¶ 19-20).

The tangible financial impact of Hewitt's misconduct includes more than $31,000 in unauthorized Amazon purchases, over $7,000 in improper UPS shipping charges, and approximately 95 missing laptops worth $400 to $800 each, or together worth between $38,000 and $76,000. (Maslanka Dec. ¶¶ 26-27). These losses clearly illustrate the extent of Hewitt's abuse of trust and the substantial financial damage incurred by Starburst.

ARGUMENT

A. This Court has jurisdiction, because the amount in controversy exceeds $75,000.

In a diversity case, the amount in controversy must exceed $75,000. 28 U.S.C. § 1332(a)(1). When a defendant raises failure to satisfy the amount in controversy requirement as the reason for arguing that dismissal under Rule 12(b)(1) is appropriate, "[u]sually, 'the sum claimed by the plaintiff controls the amount in controversy determination.'" *Foy v. State Farm Mut. Ins. Co.*, No. 3:20-CV-00261-RJC-DCK, 2021 U.S. Dist. LEXIS 250667, at *8 (W.D.N.C. Mar. 11, 2021) (quoting *JTH Tax v. Frashier,* 624 F.3d 635, 638 (4th Cir. 2010)). To "justify dismissal," "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). The assumption is that "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *Id.*, 288-89.

Once a plaintiff makes a claim in good faith that the amount in controversy exceeds $75,000, that should be the end of the story unless the defendant can show to a legal certainty that the amount falls short. Hewitt has not done that here. Instead, he offers a vague challenge with no math behind it, ignoring the actual totals laid out in the Complaint and the attached Declaration of Chief People Office Megan Maslanka (**Exhibit A**).[1]

Starburst determined that approximately 106 laptops were missing based on an extensive internal investigation following company-wide layoffs in June and July 2023, which impacted over 90 employees (Maslanka Dec. ¶ 4). Historically, Starburst has experienced a laptop return

---

[1] For purposes of factual assertions at this stage, Starburst relies on the well-pleaded allegations in its Complaint, which must be accepted as true. The accompanying Declaration of Megan Maslanka is submitted solely to address the defendant's challenge to subject matter jurisdiction under Rule 12(b)(1), specifically the amount-in-controversy requirement.

rate of about 98% from employees who leave the company, whether through termination or voluntary resignation (Maslanka Dec. ¶ 4). Given the disruptive nature of these layoffs, Starburst conservatively adjusted its expected return rate down to 68%, consistent with industry lower-bound benchmarks, resulting in an expectation of at least 61 returned laptops (Maslanka Dec. ¶¶ 5-8). During this period, Hewitt was responsible for managing and receiving returned devices (Maslanka Dec. ¶¶ 3-4, 8).

Starburst confirmed that only 45 laptops were returned during this period, all received directly by Hewitt (Maslanka Dec. ¶¶ 6-8). Further investigation revealed that Hewitt personally requested and received at least 45 additional laptops, as evidenced by vendor communications and Slack conversations (Maslanka Dec. ¶¶ 9-16). Additionally, Starburst's internal investigation linked over 80 laptop sales directly to Hewitt's personal eBay account, identified through the account username "djhewi1025," matching serial numbers and descriptions consistent with the laptops missing from the company (Maslanka Dec. ¶¶ 17-20). The cumulative evidence, including Slack messages requesting shipments to Hewitt's home addresses, unauthorized UPS shipments, and the extensive eBay sales, supports Starburst's conclusion that Hewitt diverted approximately 106 laptops (Maslanka Dec. ¶¶ 8-20).

To estimate the financial impact, Starburst relied on depreciated values and resale data from its vendor, ExpoIT, which specializes in reselling decommissioned technology. As most of the missing laptops were relatively new, with an average resale value conservatively estimated at $725 each, the total value of these missing devices alone exceeds $76,850 (Maslanka Dec. ¶¶ 19-21, 26). Moreover, Starburst uncovered an additional $31,000 in unauthorized purchases made by Hewitt through the company's Amazon Business account (Maslanka Dec. ¶¶ 21-22). These purchases were unrelated to any legitimate business needs and included various electronics and

personal consumer goods shipped directly to Hewitt's personal address (Maslanka Dec. ¶ 22). Starburst also identified over $7,000 in unauthorized UPS shipping expenses incurred by Hewitt, using the company's business account to ship items to addresses not affiliated with Starburst (Maslanka Dec. ¶¶ 23-25).

Altogether, the losses amount to more than $114,000. (Maslanka Dec. ¶¶ 26-27). This figure satisfying the jurisdictional requirement.

B. Starburst has stated claims for conversion and breach of fiduciary duty.

1. Standard of Review.

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint without resolving issues of fact or the merits of a claim. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). The Court asks whether the complaint contains "a short and plain statement of the claim showing the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the factual allegations in the complaint need only "raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus the complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). The Court must draw all reasonable factual inferences in favor of the plaintiff. *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014). "[W]ell-pleaded factual allegations are entitled to a presumption of truth, and the court should determine whether the allegations plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

2. *Hewitt converted Starburst's laptops.*

The core elements of conversion are "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Stratton v. RBC*, 712 S.E.2d 221, 227 (N.C. App. 2011). Generally, any unauthorized sale of property of another constitutes a conversion. *Parker v. First-Citizens Bank & Tr. Co.*, 229 N.C. 527, 528 (1948). Moreover, a complaint that alleges property was sold or transferred without permission "is sufficient to state a claim for damages for wrongful conversion" at the pleading stage. *Gallimore v. Sink*, 27 N.C. App. 65, 68 (1975)

Hewitt converted the laptops when he intercepted them before shipment to ExpoIT, listed them for personal sale, and began shipping them out using Starburst's UPS account. Starburst entrusted Hewitt with decommissioned laptops as part of his job responsibilities, expecting him to process these devices for reuse within the company or recycling through ExpoIT. Instead, Hewitt exploited his role to divert these laptops for his personal gain. He retained some for himself, shipped others directly to unrelated third parties, and sold numerous laptops through his personal eBay account, identified as "djhewi1025". These laptops were company property and remained under Starburst's ownership, awaiting legitimate redistribution or recycling. By taking control, selling, and shipping these laptops without authorization, Hewitt clearly engaged in conversion.

3. *Hewitt was trusted to manage these company devices, and his abuse of that trust was a clear breach of fiduciary duty.*

"Liability for breach of fiduciary duty 'is based on [the taking advantage of] a confidential relationship rather than a specific misrepresentation.'" *King v. Bryant*, 369 N.C. 451, 465 (2017) (quoting *Barger v. McCoy Hillard Parks*, 346 N.C. 650, 666 (1997). "Where a

-8-

Case 1:25-cv-00209-RDA-JGM    Document 17    Filed 07/17/25    Page 9 of 13

relation of trust and confidence exists between the parties, 'there is a duty to disclose all material facts, and failure to do so constitutes fraud.'" *Vail v. Vail*, 233 N.C. 109, 114 (1951) (citing 37 C.J.S., Fraud, Section 16, p. 247). While courts are reluctant to hold that an employee is his employer's fiduciary, *see Dalton v. Camp*, 353 N.C. 647, 652 (2001), a fiduciary duty does exist where the employee "figuratively holds all the cards"—for example, when he has "all the financial power or technical information." *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 475 (2009).

As the defendant correctly notes, *Sara Lee Corp. v. Carter*, 351 N.C. 27 (1999), is directly applicable. *Sara Lee* illustrates why Starburst's claim for breach of fiduciary duty is sufficiently pleaded. In *Sara Lee*, an employee responsible for procuring computer parts and services misused his trusted position. Instead of securing fair market pricing, the employee secretly directed company business to vendors he personally owned, charging inflated prices. The court found this misuse of trust sufficient to establish a breach of fiduciary duty. This case is similar. Starburst entrusted Hewitt with significant responsibility over company technology, specifically the handling of laptops intended for internal redistribution or recycling through the vendor ExpoIT, actions designed to provide financial returns to Starburst based on the hardware's residual value. But Hewitt abused this trust. Rather than properly processing the laptops, he diverted them for personal gain. He packaged these devices and shipped them directly to unauthorized individuals, selling them on eBay under the username "djhewi1025" and keeping the money. No profits from these sales were returned to Starburst.

Hewitt attempts to distinguish the *Sara Lee* case on the grounds that the employee in that case sold to a company he owned, whereas Hewitt sold to third parties. But this distinction is irrelevant. In both cases, the breach arose from the same fundamental misconduct: exploiting a

trusted role to profit secretly by selling company property. Under *Sara Lee,* the critical factors are trust, authority, and the abuse of that authority.

Hewitt was not simply another technology worker. He operated independently, from home, without immediate oversight. Starburst placed unique trust in Hewitt to manage the entire hardware lifecycle, from ordering to redistribution or recycling. Hewitt controlled the tracking and disposition of laptops and related equipment, with no secondary oversight. Given his role, he had a fiduciary obligation to act transparently and in Starburst's best interest. Instead, Hewitt acted secretly for his own benefit.

    4.  <u>Hewitt's actions amounted to constructive fraud.</u>

Constructive fraud occurs when there are "(1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 32 (2003); see also *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 115 (1986) ("[c]onstructive fraud arises where a confidential *or* fiduciary relationship exists…") (emphasis added). While the elements of constructive fraud and breach of fiduciary duty overlap, they are separate claims. *See Trillium Ridge Condo. Ass'n v. Trillium Links & Vill., LLC*, 236 N.C. App. 478 (N.C. Ct. App. 2007).

The relationship between Starburst and Hewitt was rooted in trust and confidence. Hewitt was specifically entrusted with the critical responsibility of managing the company's laptops, including overseeing their distribution, tracking, and final disposition. His role provided him with authority and control over significant company assets without daily oversight. He held administrative credentials for critical systems such as the Amazon Business account, Apple

Business Manager, and UPS shipping portal, and had substantial purchasing authority and logistical access. He made numerous unauthorized actions, including shipments of company laptops directly to his home, confirmed by tracking records, and subsequent sales through his personal eBay account "djhewi1025". Additionally, Hewitt incurred over $31,000 in unauthorized Amazon purchases, shipped directly to his personal address, and more than $7,000 in unauthorized shipping costs charged to Starburst's UPS account. Such conduct constitutes constructive fraud, *see Sullivan*, 158 N.C. App. at 32, as Hewitt intentionally abused his fiduciary responsibilities for his own benefit.

## CONCLUSION

Starburst trusted Joshua Hewitt to responsibly manage the company's hardware. Instead, he diverted approximately 106 laptops from the company's inventory for his own gain. When confronted about the missing laptops, Hewitt returned only 11. Hewitt shipped many of the remaining laptops to third parties, some via Hewitt's personal eBay account. Starburst's estimated financial loss from these laptops alone exceeds $76,000. Beyond the laptops, Hewitt caused additional loss by making unauthorized personal Amazon purchases totaling over $31,000 and accumulating more than $7,000 in improper UPS shipping expenses. This intentional and harmful misconduct caused tangible injury to Starburst in an amount that exceeds the jurisdictional limit.

The motion should be denied.

Respectfully submitted

STARBUST DATA, INC.

By its attorneys

*/s/ Ryan G. Douglas*
Theodore J. Folkman (special appearance)
Julayne Lazar (special appearance)
Ryan G. Douglas (special appearance)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
rdouglas@rubinrudman.com



By: /s/ Bo Caudill
Bo Caudill
N.C. Bar No. 45104
bocaudill@villmercaudill.com
Villmer Caudill, PLLC
P.O. Box 18186
Charlotte, NC 28218
Tel: (704) 216-8255
*Local Counsel*

-12-