IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Greensboro Division

| | | |
|---|---|---|
| STARBURST DATA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-209 (RDA/JLW) |
| | ) | |
| JOSHUA ROBERT HEWITT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Joshua Robert Hewitt's Motion to Dismiss (Dkt. 12). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b). These matters have been fully briefed and are now ripe for disposition. Considering the Motion together with the Complaint (Dkt. 1), the Memorandum in Support (Dkt. 13), the Declaration (Dkt. 14), the Response and Affidavit (Dkts. 17, 17-1), and the Reply (Dkt. 20), this Court DENIES the Motion for the reasons that follow.

I.  BACKGROUND

A.  Factual Background[1]

Plaintiff Starburst Data, Inc. asserts that Defendant Joshua Hewitt was a trusted employee that had sole control of Plaintiff's hardware and software inventory and access to the company's credit accounts. Dkt. 1 ¶ 1. Plaintiff further asserts that an internal investigation revealed that

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

Defendant stole Plaintiff's equipment and then shipped it, at Plaintiff's expense, to friends and other third parties as well as using Plaintiff's credit for his personal benefit. *Id.*

Plaintiff is a Delaware corporation with its principal place of business in Massachusetts. *Id.* ¶ 2. Defendant is a citizen of North Carolina. *Id.* ¶ 3. Plaintiff alleges that the matter in controversy exceeds the sum of $75,000. *Id.* ¶ 4.

Plaintiff was founded in 2017 and is a data analytics platform that provides a single point of access to query and store large amounts of data. *Id.* ¶ 7. Defendant began working for Plaintiff as a remote employee from High Point, North Carolina as a Systems Engineer in December 2021. *Id.* ¶ 8. Defendant was Plaintiff's primary contact with all of Plaintiff's hardware and software vendors. *Id.* ¶ 9. He also had sole responsibility for managing Plaintiff's computer equipment and peripheral inventory. *Id.* ¶ 10. Plaintiff gave Defendant administrator access to its Amazon Business account, Apple Business Manager account, and UPS account. *Id.* ¶ 11. Defendant also had access to Plaintiff's credit cards, which had a combined limit of $365,000. *Id.* ¶ 12. When an employee was terminated, Defendant had responsibility for inventorying the equipment in the employee's possession and returning it to Plaintiff's asset vendor, ExpoIT. *Id.* ¶ 13.

On October 14, 2024, Plaintiff's former Information Technology Manager, Larry Bullins, informed the Human Resources department that he had discovered, prior to Bullins' last day of work on October 12, 2024, that Defendant had made a few unauthorized personal purchases using Plaintiff's accounts. *Id.* ¶ 15. Bullins recommend that Plaintiff investigate further. *Id.* Following some initial inquiries, including conversations with Defendant, Plaintiff placed Defendant on administrative leave and began an internal investigation. *Id.* ¶ 16.

On October 29, 2024, Plaintiff's Chief People Officer, Megan Maslanka, asked Defendant about two credit card expenses that did not have a supporting receipt. *Id.* ¶ 17. Defendant told

Maslanka that he was unaware of the purchases and would "ask around" to find out about the purchases. *Id.* ¶ 18. Maslanka told Defendant that Defendant needed to report the purchases as fraud. *Id.* ¶ 19. Defendant informed Maslanka that the two companies from which someone had made the purchases, Adorama and B&H Photo, could not provide any information about the purchases for privacy reasons, but that they had cancelled the orders. *Id.* ¶ 20.

Maslanka began to oversee the internal investigation, along with Sarah Registrar-Beyer,[2] Plaintiff's Director of People Programs and Operations, and Christine Ryan, Human Resources Business Partner. *Id.* ¶ 21. As part of the internal investigation, Maslanka, Registrar-Beyer, and Ryan accessed Plaintiff's Amazon Business account to compare purchases against Plaintiff's Information Technology spend. *Id.* ¶ 22. On October 30 and 31, 2024, Registrar-Beyer interviewed Defendant as part of the internal investigation. *Id.* ¶ 23. Registrar-Beyer asked Defendant about over $31,000 in Amazon purchases, including gaming sound cards, a gaming wireless mouse, a gaming keyboard, switches, cables, cords, routers, headphones, iPads, and iPhone accessories. *Id.* ¶ 24. In response, Defendant stated that all of the purchases were approved by Bullins, even though Plaintiff did not have a business need for some of the equipment that Defendant purchased. *Id.* ¶ 25. Registrar-Beyer then interviewed Bullins who stated that Defendant's explanation was false, that he had not approved any of the purchases, and that he had reported Defendant's expenditures to human resources for investigation. *Id.* ¶ 26.

On October 31, 2024, Maslanka reviewed Plaintiff's UPS account as part of the internal investigation. *Id.* ¶ 27. Maslanka discovered that Defendant had been using the account to ship equipment to third-party non-employees, with some of the charges of more than $600 per overnight

---

[2] Plaintiff alternates between referring to "Registrar-Beyer" and "Registrar-Byer," because "Registrar-Beyer" was used first that is the name that the Court uses.

shipment. *Id.* ¶ 28. The UPS account history contained pictures of laptop boxes that Defendant had uploaded to document shipments throughout the United States to third party non-employees. *Id.* ¶ 29.

On November 1, 2024, Ryan contacted a listed account from the UPS account history, Highland Restaurant Supply in Fall River, Massachusetts. *Id.* ¶ 30. "Brandon," a representative for Highland Restaurant Supply, stated that "his friend" had sent him a laptop; Brandon then identified Defendant, by name, as the person who had sent him the laptop. *Id.* ¶ 31.

Registrar-Beyer researched Plaintiff's Apple Care account and found that there were gaps in the transfer of Plaintiff's devices. *Id.* ¶ 32. Registrar-Beyer then reviewed Plaintiff's Apple Business Account and found that Defendant had released many laptops from Plaintiff's account and re-allocated them to third-party non-employees. *Id.* ¶ 32.

On November 1, 2024, Ryan also ran an eBay search using Defendant's personal email address and found that Defendant had an account established under the username djhewi1025. *Id.* ¶ 33. According to eBay's history of the djhewi1025 account, Defendant sold over 80 laptops and peripherals on eBay. *Id.* ¶ 34. On information and belief (the eBay listings do not show serial numbers, but the descriptions of the laptops matched the laptops that Plaintiff uses in its business), these items belonged to Plaintiff, and Defendant had sold them for his own profit. *Id.*

That same day, Maslanka, Registrar-Beyer, and Ryan met with representatives from Plaintiff's external IT asset manager, ExpoIT. *Id.* ¶ 35. During this meeting, they found that there were significant gaps in the inventory that Defendant was responsible for managing. *Id.* ¶ 36. They also learned that Defendant had an unusually high number of requests to ExpoIT to send equipment directly to his home address. *Id.* ¶ 37. ExpoIT ordinarily ships the equipment directly to employees for their use. *Id.* Based on what Maslanka, Registrar-Beyer, and Ryan learned in

4

this meeting, Plaintiff estimates that approximately 106 laptops under Defendant's management were missing. *Id.* ¶ 38.

On November 4, 2024, Maslanka discovered that Defendant had made unauthorized personal charges on his company credit card accounts with no business purpose. *Id.* ¶ 39. These personal charges included monthly subscriptions for Microsoft gaming programs and for Google voice accounts. *Id.* During the investigation, Defendant claimed that all of his purchases were for business purposes, were approved by superiors, or both. *Id.* ¶ 40. Defendant's superiors denied that they had approved his purchases and stated his explanation was false. *Id.* ¶ 41.

On November 11, 2024, while on administrative leave, Defendant made another attempt to ship an item, without a business justification, using Plaintiff's UPS account at a cost of $132.87. *Id.* ¶ 42. UPS declined to ship the item, as Plaintiff had suspended Defendant's access to its accounts. *Id.*

Plaintiff terminated Defendant's employment for cause, effective October 31, 2024. *Id.* ¶ 43.

As part of the investigation, Plaintiff confirmed that it is missing over 46 laptops by serial number, with a value of $2,000 to $5,000 per laptop and an expected four-year life. *Id.* ¶ 44. Defendant was responsible for managing and overseeing these laptops. *Id.* Plaintiff also confirmed that there are an additional 60 unaccounted for laptops that either ExpoIT or employees whose employment had ended in FY24 or FY25 had shipped directly to Defendant's home address. *Id.* ¶ 45. Plaintiff has been forced to purchase additional laptops for employees, and it did not receive retired laptop credits from its vendors. *Id.* ¶ 46. Those credits range from $400 to $800 per laptop. *Id.* Based on Plaintiff having to replace a laptop sooner than anticipated based on

Defendant's actions, the cost of misappropriating one laptop ranges from approximately $5,000 to $10,000 based on the laptop model and early replacement.

Plaintiff has also incurred at least $31,000 in fraudulent Amazon purchases on its Amazon Business Account by Defendant, and these unaccounted for purchases mostly involved computer peripherals. *Id.* ¶ 48. Defendant also utilized Plaintiff's UPS account for total shipping charges of at least $7,000 that were not business shipments. *Id.* ¶ 49.

Plaintiff's counsel sent a demand to Defendant seeking a return of its property or full restitution. *Id.* ¶ 50. Defendant then returned 11 laptops. *Id.* ¶ 51. There are still 95 laptops missing. *Id.* ¶ 52. Plaintiff estimates that it has suffered damages in the amount of at least $475,000 to $1.425 million as a result of Defendant's acts. *Id.* ¶ 53.

### B. Procedural Background

On March 18, 2025, Plaintiff filed its Complaint. Dkt. 1. After extensions of time to respond, Defendant filed his Motion to Dismiss on June 20, 2025. Dkt. 12. Plaintiff thereafter received its own extension of time and filed a timely opposition. Dkt. 17.

On July 28, 2025, this case was reassigned to this District Judge sitting by designation in the Middle District of North Carolina by order of Chief Judge Albert Diaz. Dkt. 19.

On July 31, 2025, Defendant filed his Reply. Dkt. 20.

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction over a lawsuit. Fed. R. Civ. P. 12(b)(1). A plaintiff bears the burden to demonstrate that subject matter jurisdiction exists. *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). A court should only grant a 12(b)(1) motion to dismiss "if the material jurisdictional facts are not in dispute and the moving party is

6

entitled to prevail as a matter of law." *Richmond, Fredericksburg, & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Here, Plaintiff relies on diversity jurisdiction, where all parties are citizens of different states and the amount-in-controversy exceeds $75,000. 28 U.S.C. § 1332(a). In most cases, the "sum claimed by the plaintiff controls" the amount in controversy determination. *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010). If the plaintiff claims a sum sufficient to satisfy the statutory requirement, a federal court may dismiss only if "it is apparent *to a legal certainty*, that the plaintiff cannot recover the amount claimed." *Id.* (emphasis in original). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside of the pleadings without converting the proceedings to one for summary judgment." *Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

### B. Rule 12(b)(6)

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v.*

7

*Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## III.   ANALYSIS

Defendant first challenges Plaintiff's allegations regarding the amount in controversy. In the alternative, Defendant argues that each count of the Complaint fails to state a claim. The Court will analyze each argument in turn.

### A.   Amount-in-Controversy

Defendant argues that Plaintiff's allegations of damages in the Complaint vastly overstate the actual possible damages. Dkt. 13 at 7. Defendant argues that using the 11 laptops that Defendant returned as a sample size and reviewing the secondary market for those laptops the value would be less than $75,000. *Id.*; Dkt. 13-1. Defendant asserts that the value for MacBook Air models would be between $257 and $443 and for MacBook Pro Models would be between $721 and $1,173. *Id.* Thus, based on Defendant's own calculations, for the 95 missing laptops, the value would be: (i) between $24,415 to $42,085, if all of the laptops were MacBook Airs; and (ii) between $68,495 to $111,435 if they were all MacBook Pro models. *Id.* Defendant further notes that Plaintiff's alternative calculation, based on the credits that Plaintiff would have received of $400-800 per laptop, yields a range of $38,00-$76,000 for the 95 laptops. *Id.*

The Court cannot say that "it is apparent *to a legal certainty*, that the plaintiff cannot recover the amount claimed." *JTH Tax, Inc*, 624 F.3d at 638. Using just Defendant's low-end calculation of the credit that Plaintiff would have received for the 95 laptops ($38,000) plus the

$31,000 in fraudulent Amazon purchases, plus the $7,000 in fraudulent UPS expenses,[3] Plaintiff's damages exceed the $75,000 threshold. Alternatively, using Defendant's sample of returned laptops, approximately one-third of the laptops that Defendant returned were MacBook Pros and the rest MacBook Airs. Dkt. 13 at 7 n.21 (alleging he returned six MacBook Airs and three MacBook Pros).[4] And, using the lowest possible value as estimated by *Defendant* and applying the same proportion of MacBook Airs versus MacBook Pros, the total value of the 95 computers would be $38,799 using the calculation: (31x $721 (MacBook Pro)) + (64 x $257 (MacBook Air)). That $38,799 plus the $38,000 in other damages also exceeds the jurisdictional threshold.

Because the Court cannot say to a legal certainty that the allegations of damages fail to meet the jurisdictional threshold, the motion to dismiss based on lack of diversity jurisdiction will be denied.

### B. Failure to State a Claim

Plaintiff asserts five causes of action in the Complaint: (i) conversion (Count 1); (ii) breach of fiduciary duty (Count 2); (iii) constructive fraud (Count 3); (iv) larceny (Count 4); and (v) unjust enrichment (Count 5). Dkt. 1. Defendant argues that Counts 1, 2, and 3 should be dismissed for failure to state a claim because: (i) Plaintiff lacked ownership of the laptops; and (ii) Defendant

---

[3] Defendant's attempt to attack the alleged fraudulent charges is unavailing. Whether the charges were actually fraudulent is a merits argument, and the Court cannot determine it to a legal certainty on a motion to dismiss. Moreover, the damages are not as speculative as Defendant alleges, because Plaintiff has supported the allegations with the declaration of Maslanka and associated logs. Dkt. 17-1 ¶¶ 21-24.

[4] A review of the 45 laptops that Plaintiff asserts were returned to Defendant and which remained unaccounted for, suggests that it was closer to a fifty-fifty split, but for purposes of this analysis, the Court extrapolates from the numbers provided by Defendant. *See* Dkt. 17-1 at Exhibit H (21 of the laptops were MacBook Airs, 19 were MacBook Pros, remaining 5 fell into a different category).

did not owe a fiduciary duty to Plaintiff. Dkt. 13 at 2. The Court will analyze each argument in turn.

### i. Conversion

The parties generally agree that, under North Carolina law, the "tort of conversion is well defined as 'an unauthorized assumption and exercise of the right of ownership over goods or chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012). Defendant argues that Plaintiff has pled "itself out of a viable conversion claim" because Plaintiff simultaneously claims that: "(1) it transferred ownership of the laptops to ExpoIT in exchange for disposal credits valued at $400-$800, and (2) Hewitt converted the laptops from Starburst by requesting them from ExpoIT." Dkt. 13 at 10. This argument misreads the Complaint.

As the Court understands the Complaint, Plaintiff alleges that: (i) there were a set of laptops that were being decommissioned that were sent by employees directly to Defendant, Dkt. 1 ¶ 45; and (ii) there were a set of laptops that Defendant requested from ExpoIT under Plaintiff's account that were delivered directly to Defendant, *id.* ¶¶ 37, 45. Thus, it appears that there are two sets of laptops, some that were being returned and some being requested. And, for those being returned, Plaintiff alleges that, if the laptops were returned to ExpoIT, then Plaintiff could receive a credit for those returned laptops. *Id.* ¶ 46. But Plaintiff has expressly alleged that "it did not receive retired laptop credits from its vendors." *Id.* ¶ 46.

Thus, with respect to the decommissioned laptops, Plaintiff has alleged that Defendant intercepted the laptops before ownership was transferred to ExpoIT. Defendant was Plaintiff's employee, thus employee's transfer of the laptops to Defendant does not appear sufficient to transfer ownership to ExpoIT. Further, Plaintiff has alleged that Defendant interfered with

10

Plaintiff's ownership rights by selling the decommissioned or returned laptops for himself. This is sufficient to state a claim for conversion under North Carolina law. Moreover, Defendant's reliance on *Willard v. Barger*, 2019 WL 2331535 (N.C. Super. May 29, 2019) is unavailing because Plaintiff has not alleged that Plaintiff does not have an ownership interest in the laptops. *See id.* at *3 (dismissing conversion claim where plaintiff alleged that it did not have direct ownership, but, rather, had an ownership stake in a corporation that owned the asset).

Similarly, Plaintiff has stated a conversion claim with respect to the second set of laptops. Plaintiff has alleged that Defendant, using Plaintiff's account, requisitioned laptops from ExpoIT, that those laptops were sent directly to Defendant, and that those laptops were not subsequently passed on to other employees. Dkt. 1 ¶ 36-38, 45. Thus, Plaintiff alleges that Defendant purchased the laptops on Plaintiff's behalf and then used them for his own purposes. *Id.* ¶ 34. This too is sufficient to state a claim for conversion. Accordingly, the Motion to Dismiss will be denied in this regard.

### ii. Breach of Fiduciary Duty

To state a claim for breach of a fiduciary duty under North Carlina law, a plaintiff must show: "the existence of a fiduciary relationship between the parties, breach of a duty required by that relationship, and injury proximately caused by the breach." *Folmar v. Harris*, 650 F. App'x 818, 822 (4th Cir. 2016) (citing *Dalton v. Camp*, 353 N.C. 647 (2001)). The Supreme Court of North Carolina defines a fiduciary relationship as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dalton*, 353 N.C. at 651. Generally, however, the Supreme Court of North Carolina has held that "the relation of employer and employee is not one of those regarded as confidential." *Id.* Although that is the general rule,

North Carolina courts have recognized a fiduciary relationship can arise where an employee is "appointed by his [employer] primarily to bring about business relationships between the [employer] and third persons." *Sara Lee Corp. v. Carter*, 129 N.C. App. 464, 470 (1998), *rev'd in part on other grounds*, 351 N.C. 27 (1999).

It appears that the key distinguishing fact between those relationships falling under the *Dalton* line of cases where there is no fiduciary relationship and those falling under the *Sara Lee* line of cases where there is a fiduciary relationship is whether the defendant "abused [a] trusted position to engage in self-dealing." *Cisco Sys., Inc. v. Khan*, 2019 WL 8333527, at *4 (E.D.N.C. May 28, 2019). Here, Plaintiff has alleged sufficient facts, at the motion-to-dismiss stage, to plausibly allege such a relationship. Plaintiff alleges that Defendant had access to and use of its Amazon Business Account, UPS Account, ExpoIT account, and Apple account and that he used such accounts to engage in self-dealing to purchase materials using Plaintiff's funds and sell them for his own profit. Moreover, Defendant was a remote employee and was the primary contact with Plaintiff's vendors. Thus, at this point, the Court finds that Plaintiff has alleged that Defendant was vested with significant authority to engage in purchasing on Plaintiff's behalf. *See also Global Textile Alliance, Inc. v. TDI Worldwide, LLC*, 2018 WL 6272929, at *7 (N.C. Super. Nov. 29, 2018) (denying a motion to dismiss where the defendant had control over "technical and financial information on which Plaintiff became dependent"); *Omni Logistics, LLC v. Wells*, 2025 WL 4036404, at *5 (W.D.N.C. Dec. 22, 2025) (holding that allegations that a defendant was sales director and touched every part of the sales process was sufficient to survive a motion to dismiss). Accordingly, the Motion to Dismiss will be denied in this regard.[5]

---

[5] Defendant is, of course, welcome to renew this argument at a later stage of the case, should the facts develop differently than alleged in the Complaint.

### iii. Constructive Fraud

Defendant's argument in support of dismissing the constructive fraud claim rises and falls with his fiduciary duty argument. Dkt. 13 at 16 (arguing that the constructive fraud claim fails because Defendant did not owe a fiduciary duty). Because this Court has found that Plaintiff adequately alleges a breach of fiduciary duty, the Court will also deny the Motion to Dismiss in this regard.

### IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 12) is DENIED.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all parties of record.

It is SO ORDERED.

Alexandria, Virginia
February 2, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge